FOSTER *et al.*, *Plaintiffs in Error*, v. BELCHER'S SUGAR REFINING COMPANY *et al.*

### Division Two, November 21, 1893.

1. **Corporation:** STOCK: SUBSCRIPTION. Corporate stock may be paid for by the subscriber in property at a fair and honest valuation.

2. ——: ——: LACHES. Where parties have bought and dealt with stock for thirty years as valid and have for that time received annual dividends on the whole issue without questioning its validity objection to the latter is barred by laches.

3. ——: LOAN, BY DIRECTORS. A director may, in good faith, loan his money to the corporation for its legitimate purposes and hold it as a valid claim against the corporation.

Foster v. Belcher's Sugar Refining Co.

4. ——: LIABILITIES: DIRECTORS. It is the duty of the directors of a corporation to provide for the payment of its liabilities and they are entitled to commendation if, when its treasury is depleted, they pay its debts out of their personal means.

5. ——: ——: ——. The facts of this case *held* to show no evidence of fraud on the part of the defendant directors of defendant corporation authorizing the cancellation of its bonds or the enjoining the foreclosure of the mortgage given to secure them.

*Error to St. Louis City Circuit Court.*—HON. L. B. VALLIANT, Judge.

AFFIRMED.

*Thos. B. Crews* for plaintiffs in error.

(1) The directors of a corporation occupy a fiduciary position.. They are trustees and agents of the corporation and stockholders. In general they are governed by the same rules as are applied to trustees. Angell and Ames on Corporations [11 Ed.], sec. 312, pp. 344, 345; *Patrick v. Gas Light Co.*, 17 Mo. App. 462; *Chouteau v. Allen*, 70 Mo. 338; *Bent v. Priest*, 86 Mo. 475; *Brewster v. Stratman*, 4 Mo. App. 41; *Robinson v. Smith*, 3 Paige, 233; 1 Morawetz on Private Corporations [2 Ed.], sec. 237. p. 231; *Mallory v. Mallory-Wheeler Co.*, 38 Am. and Eng. Corp. Cases, 120. (2) Directors and officers of a corporation occupy a position of trust and must act in utmost good faith. They will not be allowed to deal with the corporate funds and property for their private gain. They have no right to deal with themselves and for the corporation at the same time, and they must account for money made by a breach of trust. *Koehler v. Iron Co.*, 2 Black (U. S.) 715–720; *Ward v. Davidson*, 89 Mo. 445–458; Woods' Field on Corporations, secs. 154–157; 1 Morawetz on Private Corporations [2 Ed.], secs. 517, 518; *McAllen v. Woodcock*, 60 Mo. 174–180; *Crescent City Co. v. Flanner*, 38 Am. and Eng. Corp. Cases, 346.

(3) Directors are bound to display in the conduct of the company's affairs at least ordinary common sense and prudence, and they will be liable to make good to the company losses which have occurred, not merely from their fraud and willful malfeasance, but also from their negligence and imprudence. Green's Brice's Ultra Vires [2 Am. Ed.], ch. 4, p. 484; *Percy v. Milloudon*, 3 La. Rep. 568; *Shea v. Mabey*, 1 B. J. Lea, 319–343; *Fougeray v. Cord*, 38 Am. and Eng. Corp. Cases, 106; *Robinson v. Smith*, 3 Paige, 222–232. (4) The directors, as such, had no authority to adjust and settle their own accounts with the corporation. They should be compelled to make a full and complete showing of their dealings as such directors with themselves as individuals, and their duty is not discharged by a simple denial of misconduct. 1 Perry on Trusts [4 Ed.], sec. 207, p. 266; *Coal Co. v. Parish*, 42 Md. 598; *Ex parte Hill*, 32 L. J. (Ch.) 154; *St. James' Church v. Church*, 45 Barb. 356. (5) The stockholders did not consent and had no opportunity to consent to the disposal of the bonds, as made. *Abbot v. Company*, 33 Barb. 580; *Association v. Coleman*, L. R., 6 H. L. 189. (6) Directors have no power to give away the funds of the corporation or to destroy its existence. *Railroad v. Bowser*, 48 Pa. St. 29. (7) The officers of a corporation cannot dissolve it and wind up its affairs. Angell and Ames on Corporations, sec. 772. (8) Bonds of corporation taken after dishonored, burden on holder to show that company received value. Thompson on Liability of Agents and Officers of Corporations, 361; *Patrick v. Gas Light Co.*, 17 Mo. App. 469. (9) The act of the legislature creating the Belcher's Sugar Refining Company exempted the charter from suspension, alteration or repeal. The laws governing corporations in force at the time of the incorporation of said company are still applicable

thereto, and subsequent constitutional and legislative enactments have not affected it. If the directors of the corporation, with knowledge of the fact that its capital stock, or a part thereof was not actually paid in, borrowed money in excess of the amount that was actually paid in, such borrowing was *ultra vires*, and the corporation is not liable upon the obligation then given, in the hands of persons taking with notice of their unlawful character. Revised Statutes, 1845, ch. 34, art. 1, sec. 20, p. 235; Laws 1854 and 1855, 323; Green's Brice's Ultra Vires [2 Am. Ed.], pt. 5, ch. 1, pp. 715, 716; *Bank v. Harrison*, 57 Mo. 503. (10) If a stipulated time is fixed for the payment of a secured debt and the debt is not paid at the time the absolute property does not pass to the pledgee. The title of the bonds never passed, and has not yet passed from the company to its alleged creditors or to any one. *Chouteau v. Allen*, 70 Mo. 290. (11) The evidence of a conveyance by Hodgman after the sale under deed of trust to the St. Louis Sugar Refining Company was immaterial. *First.* Because no such conveyance was pleaded in the answer. *Second.* The allegations of the petition were of legal title transferred through Hodgman to defendants. This was substantially supported by the evidence of a purchase by Hodgman with the means of defendants and a conveyance direct to Hodgman in trust for the use of defendants. The use created by that deed became an executed use in defendants, and Hodgman, by operation of the statute of uses, had nothing left in him to convey to the St. Louis Sugar Refining Company, nor anyone else. 2 Revised Statutes, 1889, sec. 8833.

*Smith P. Galt* for defendants in error.

(1) There could be no decree for plaintiffs, with Chaffraix and Smith absent, and plaintiff refused to

bring them in. (2) The bill of plaintiffs was properly dismissed on final hearing, as the evidence failed to support any of the material allegations of the petition. (3) *First.* As to the allegation concerning the company not being authorized to incur debts beyond the amount of its capital stock paid in, that limitation was not in the company's charter, but was a provision of the general law of 1845, which was repealable at any time, and was long since repealed, and in lieu thereof was substituted the provision of the general law authorizing corporations to issue bonds to the amount of their capital stock. Again, proof is given that at least $923,000 of the capital stock was actually paid in in property, at a fair valuation. *Second.* Even if the general provisions of the law of 1845, entered into and formed part of the charter of the company, it was repealable, as it is not every change, which is to be regarded as altering the contract (if the general law entered into the charter and formed part of a contract), and this change in the general law comes within that class of cases, in which the change is held to be auxiliary to the original object of the incorporation, and beneficial to the stockholders. Pierce on Railroad Law, p. 66, note 10, and authorities there cited; *Taggert v. Railroad*, 24 Md. 597; *Wilson v. Railroad*, 33 Ga. 466. (4) If the plaintiffs had any right to complain of any act done by the board of directors or the defendants, they lost their right to relief in a court of equity by unreasonable delay in complaining. *Peabody v. Flint*, 6 Allen, 57 (citing *Veazie v. Williams*, 3 Story, 610; *Tash v. Adams*, 10 Cush. 252; *Fuller v. Melrose*, 1 Allen, 166; Story on Equity, sec. 1520, note 3). (5) This whole proceeding, the time it was commenced, the attempt made to enjoin the sale, the way in which the suit was delayed, the reckless allegations of the original and amended bill unsustained by any proof, of which Foster admits

in his testimony he had no knowledge or information, and the testimony of plaintiffs, show, that this proceeding was solely for the purpose of compelling the parties, who had advanced large sums of money for the benefit of the company (and therefore for the plaintiffs' benefit), to buy off the plaintiff, Foster, rather than to have the recovery of their claims jeopardized, or the property securing them sacrificed by the injunction proceedings originally contemplated by the plaintiff; and therefore the whole proceeding on the part of the plaintiffs is in bad faith.   (6) While each of the above points is fatal to the plaintiffs' claims, nevertheless, the defendants would rather rest their cause upon the ground that the testimony shows that their every act, when "subjected to the closest scrutiny as to its character, consideration and good faith," (*Patrick v. Gas Light Co.*, 17 Mo. App. 469), will be found by this court, as it was by the court below, free from every taint or suspicion of fraud or unfairness, and will receive the approval of this court, as it has received the approbation of the Belcher Sugar Refining Company and its creditors and all its stockholders, except the plaintiffs, Foster and Clark, who, to further their own ends, pretend to be dissatisfied.

GANTT, P. J.—The plaintiffs in error, two of the stockholders of the Belcher's Sugar Refining Company, bring this action against said corporation, its board of directors, and certain of its stockholders.   The general scope of the bill is to restrain the sale of the new sugar refinery of said company, in St. Louis, under a deed of trust executed by said corporation to secure the payment of its bonds to the amount of $750,000, with interest coupons attached, default in the payment of which having been made, the trustees had advertised the property for sale August 18, 1885.   The bill also

prayed the appointment of a receiver, the cancellation of the bonds, etc.

The original petition charged many acts of misconduct, irregularity and fraud, on the part of said company, by its directors, officers and other defendants; that said bonds were unlawfully taken and held by persons composing the board of directors of said company; that consent of a portion of the stockholders to the issue of said bonds had been obtained upon false and fraudulent representations and inducements made by said directors and officers, and that said bonds had been unlawfully appropriated by defendants without sufficient consideration, and in an unlawful manner; that the affairs of said company had been mismanaged and its funds unlawfully diverted from proper channels in furtherance of a design on the part of defendants to unlawfully secure for themselves the entire property and assets of said company, to the great injury of its stockholders; that in violation of their duty and lawful authority and powers, the persons composing the said board of directors, acting as such board, had sold said bonds to themselves for pretended obligations of said company to them, and had in the same manner disposed of other valuable assets of said company; that the pretended owners and holders of said bonds, and all the said defendants, had notice of the unlawful and wrongful acts and things complained of, at and long before the time of the pretended sale of said bonds.

The application for injunction was denied, the plaintiffs having been granted leave to amend their bill, the sale under the deed of trust was proceeded with as advertised on the said eighteenth day of August, and the property thereby conveyed was knocked down and sold on that day to Charles Hodgman, Esq., as trustee for said bondholders, who purchased under written authority from them constituting him such trustee.

Plaintiff's subsequently filed their amended petition, the substantial averments of which are as follows:

That by an act of the general assembly of the state of Missouri, entitled "An act to incorporate Belcher's Sugar Refining Company," approved January 25, 1855, William .H. Belcher, Rufus J. Lackland, Geo. D. Humphreys, Chas. W. Horn and eight others, their successors and associates, were constituted a body corporate and politic for a period of fifty years, by the name of "Belcher's Sugar Refining Company;" that the business of said company was the buying, selling and refining of sugars and syrups; that by said act it was provided that the capital stock should be $1,000,000; that the board of directors should not be less than five, but might be increased to seven by vote of the stockholders; that as soon as stock to the amount of $600,000 should be subscribed an election should be held for directors, and that on the first Monday in December in each year an election of directors should be held to serve the ensuing year and until their successors should be duly elected; that in the year 1855 William H. Belcher and Charles Belcher, composing the firm of Belcher & Bro., were involved and insolvent, and in pursuance of a compromise with their creditors they subscribed the entire capital stock and purported to pay it up by conveyance to the company of a refinery and other property by them owned at a false valuation of $1, 000,000, but of the actual value of only $500,000, and that stock was falsely issued as full paid up, and that the same had never been paid up; that plaintiffs without notice that the stock was not paid up, purchased the stock owned by them for persons holding certificates for paid up stock.

The petition sets out the names of the persons composing the board of directors of the company during the years 1881, 1882, 1883 and 1884, showing that

during those years the persons named as defendants in this suit composed a majority of said board and at the time of the filing of said suit were still managing and controlling said company as its board of directors, and alleges that said officers and directors were inimical to plaintiffs and not proper persons to have charge of any suit in the name of the corporation, and that plaintiffs were without remedy otherwise than by this suit.

That in the year 1881, the board of directors of said corporation entered upon the work of causing a new refinery to be erected for said company and without authority to contract debts in excess of its paid up capital stock contracted pretended debts far in excess thereof. That said corporation had no available means for the erection of said refinery, and said directors knew that the erection of said refinery would imperil all of the property and assets of the corporation, and that they do not act in good faith for the benefit of the corporation; that the building of the new refinery was carried on in a reckless, negligent and extravagant manner and that the business of said company was, finally, in 1884, closed and its works shut down in consequence of the mismanagement and bad faith of said directors. The petition then sets out the meeting of the stockholders on December 20, 1883, called for the purpose of securing an issue of bonds to the amount of $750,000, and the deed of trust on the property of the company; the subsequent issue by the board of the bonds and deed of trust in January 1884, and a description of the property conveyed by George S. Drake and Hugh McKittrick, trustees in said deed of trust, with the recitals and conditions in said deed contained. That long before the time of the execution of said bonds and said deed of trust the said directors had illegally contracted pretended debts, largely in excess of the amount for which said corporation was authorized by

law to become at any one time indebted, and, by mismanagement of the affairs of said corporation and appropriating its means to the building of said new refinery while they at the same time conducted the ordinary business of said corporation upon a large scale, as the same was conducted before its means were so tied up, said directors had, long before the time of the execution of said bonds, rendered said corporation unable to continue its usual business, notwithstanding all which said directors until November 1884, and afterward, did continue said business and continued to add to the appurtenances of said new refinery and to make improvements and additions thereto at the cost and charge of said corporation.

That after the execution of said bonds and coupons and deed of trust, defendants, Rufus J. Lackland, Carlos S. Greeley, Robt. A. Barnes, William A. Hargadine, George E. Leighton, William L. Scott, and William E. Smith, then being the directors and composing the board of directors of said corporation, and having charge of its business and affairs, claiming in their several individual capacities as against said corporation to be creditors of said corporation for moneys claimed to have been by them in their individual capacities loaned to, or paid to the use of, said corporation, while the same was under their charge and control as such directors, as well as for interest upon moneys so claimed to have been loaned or paid, undertook and assumed among themselves to liquidate and provide for the payment of the amount of their said several claims against said corporation by selling to themselves the bonds aforesaid to the amount of their said claims against said corporation, and for that purpose did cause and procure the said bonds to be delivered as follows, to-wit: To said Lackland, one hundred of said bonds; to said Greeley, one hundred of said bonds; to said

Barnes, one hundred and fifty of said bonds; to said Hargadine, one hundred of said bonds, and to said Hargadine, as trustee of estate of Wayman Crow, twenty-five of said bonds; to George E. Leighton, twenty of said bonds; to William E. Smith, fifty of said bonds. That the directors last named in their conduct of the business of said corporation also delivered of the said seven hundred and fifty of said bonds, twenty to defendant, George S. Drake, fifteen to defendant, D. A. Chaffraix, and one hundred and sixty to defendant, Boatmen's Saving Bank. That the delivery of said bonds was without any consideration other than the satisfaction of pretended obligations or illegal debts of said corporation, and as to the said directors there were no consideration for the delivery of said bonds other than pretended illegal demands of said directors, and which said claims said directors had no power or authority as directors of said corporation to liquidate or adjust.

That said Lackland, Greeley, Barnes, Hargadine, Leighton and Smith, at and long before, and even since the time when they so took and divided among themselves said bonds, composed a majority of the board of directors of said corporation, and from the time said bonds were issued and so disposed of they also controlled said bonds. That they procured the assent of a number of the stockholders of said corporation, to the issue of said bonds under pretense that said bonds were to be sold to raise money for carrying on the usual business of said corporation, which said pretense was a false pretense, and a mere deception, and the real object in the issue of said bonds was thereby to secure to themselves the property of said corporation in fraud of the stockholders of said corporation. That after they had so disposed of seven hundred and forty-seven of said bonds to themselves, they as directors of

said corporation, permitted and caused said corporation to make default in payment of the interest coupons, for more than sixty days, and taking advantage of their said neglect and misconduct as such directors caused the said McKittrick and one Edward Whittaker, as successor to said Drake, to advertise for sale, on the eighteenth day of August, 1885, under said deed and for the payment of said bonds, all the property by said deed conveyed. And that on said date, and since the filing of the original petition, said trustees made said sale to Charles Hodgman, who, at such sale, purchased said property for, on behalf of, and as, trustee of the bondholders aforesaid. That since that time said trustees have executed and delivered to the persons last mentioned deeds of conveyance of the property so sold and delivered possession to said grantees, and said grantees now have possession and control of all said property.

That from the time of the execution of the bonds, and for a long time theretofore, the directors of said corporation made no effort and took no care to keep the business of said company within limits suitable to its financial condition, and after the execution of said bonds they failed and neglected to guard against the principal sums of said bonds becoming at once payable by reason of default in the payment of interest, but willfully mismanaged the business of said corporation and caused and permitted such default to be made, with intent to make for themselves, individually, profit and advantage out of the property of said corporation by and through the sale of said property, under said deed, for the payment of the bonds. That there was no consideration for the delivery of said bonds so delivered to said George S. Drake, D. A. Chaffraix and Boatmen's Saving Bank, other than the illegal consideration of obligations pretended to be incurred in

behalf of said corporation by its said directors, and that they took said bonds with notice of the illegality of said obligations. That at the time of the issue of said bonds and of the sale under said deed of trust, said parties taking said bonds as aforesaid and said pur-- chasers and grantees under said deed and said trustees, McKittrick and Whittaker, severally, had notice of all and singular the matters and things herein averred, so far as said matters and things had at said several times transpired.

The defendants, except Chaffraix and Smith, who were not served, made joint answer and denied the charges of the petition.

On the trial in the circuit court, the following facts were established:

Belcher's Sugar Refining Company was created by an act of the General Assembly of the State of Missouri, approved January 25, 1855, and by the same, William H. Belcher, Rufus J. Lackland, George D. Humphreys, Chas. W. Horn, Edward Walsh, Derrick A. January, William M. Morrison, Edward Wyman, Joseph C. Cabot, Constance J. Peipers, Edward Y. Ware and Charles Belcher and their associates and successors were constituted a body corporate and politic for the period of fifty years from that date, by the name of "Belcher's Sugar Refining Company," with the ordin-- ary powers incident to the transaction of its business and were authorized to carry on the business of buying, selling and refining sugars and syrups. The act provided that the capital should be $1,000,000, with authority to increase the same to $1,500,000 by vote of stockholders. That books should be opened for subscription and kept open until the whole of the stock should be subscribed and that payment should be made in such sums and at such times as the board of directors should require. That the affairs of the

corporation should be managed by a board of not less than five directors who shall be stockholders, and the stockholders might by vote increase the number to seven. That as soon as stock to the amount of $600,000 should be subscribed, an election of directors should be held by the stockholders, and that on the first Monday in December in each year an election should be held for directors to serve the ensuing year and until their successors should be duly elected. In the year 1855 the entire capital stock was subscribed and afterwards five directors were elected.

At the time of the passage of this act William H. Belcher and his brother Chas. Belcher were partners, doing business as Belcher & Bro., and were the owners of the sugar refinery and other property used in connection therewith. They were largely indebted and greatly embarrassed, and out of this embarrassment originated the scheme to create the corporation. After the corporation was organized under the act of 1855, *supra*, "Belcher & Bro." and Wm. H. Belcher submitted to the corporation a proposition to sell to it their refinery and the property appurtenant to it, "at a fair and proper valuation." At a meeting of the board this proposition was discussed and the following resolution unanimously adopted:

"Resolved. That the board accept the proposition contained in the foregoing communication and that the matter of the valuation of the property proposed to be conveyed to the company be referred to Messrs. Samuel Gaty and William Palm with authority to call to their aid such other persons as they may see fit; and that the amount of stock *to be finally* issued to Belcher & Bro. and William H. Belcher, be settled by the value of said property as hereafter determined between them and the board."

In pursuance of this proposition and acceptance,

Belcher & Bro., and W. H. Belcher conveyed their refinery to the corporation and thereupon, *prior* to the appraisement provided for, "the board being satisfied that the property so conveyed *was of greater value*, than $500,000," directed "that stock to the amount of $500,000 be issued to Belcher & Bro., in conformity to the by-laws."

From the proceedings of the board of directors, March 12, 1855 it appears: "That after February 6, 1855, an appraisement was made, that the appraisement of real estate, machinery, etc., by Messrs. Gaty, Palm and others, at the sum of $861,102, and inventory stock, boneblack, cooperage, drays, mules, etc., furnished by Wm. H. Belcher, amounting to $176,511, less amount assumed by the company, say $60,000, leaving balance of $116,511, be approved and accepted by this board, and stock be issued to Belcher & Bro., and William H. Belcher to amount of say $922,613, and that the resolution of board adopted at meeting February 6, 1855, relative to issue of stock to them, be and same is hereby rescinded." It appears that all the property of said parties was transferred to the company to the amount of $922,613.

The corporation commenced and continued its business with varying success but it was enabled to pay six per cent. dividends annually upon its stock, and although at times sustaining heavy losses, these were more than offset by the profit made, and for a period of about twenty-five years after its creation the company maintained a steady and prosperous course, and its stock acquired a reputation which found for it a ready sale in the markets at uniformly good prices, and often above par. One of the plaintiffs, Mr. Foster, testifies that as much as $135 per share was paid in 1873 for some of the stock held by him. The plaintiffs purchased their stock long prior to the year

1880, and down to that year nothing seems to have occurred to affect credit or general stability of the company. At the election for directors, held December 6, 1880, the following directors were elected for the ensuing year: R. J. Lackland, C. S. Greeley, R. A. Barnes, W. A. Hargadine, E. A. Hitchcock, W. L. Scott and Charles Belcher. Mr. Belcher, who had been the President for many years, retired and Mr. W. L. Scott was elected President; Mr. E. C. Cushman, succeeded Mr. Belcher, as a director. As evidencing the uncertainty of business, it was shown that the loss in 1857 was $329,000; in 1877, $443,000, and in 1884, $459,000.

Two of its directors of its first board, elected in 1855, Rufus J. Lackland and Carlos S. Greeley, continued with the company through all its ups and downs to the end, and are among the defendants in this suit. With them were associated for many years before the company's final collapse, William A. Hargadine, Robert A. Barnes, Wayman Crow, George S. Drake and George E. Leighton, being generally unanimously elected year after year. When the company collapsed in 1885, and at the time this suit was brought, Wm. A. Hargadine held in his own right two hundred and sixty-two shares of stock, and as trustee one hundred and eight shares, Robt. A. Barnes one thousand and twenty-nine shares, Wayman Crow (and after his death, his estate) two hundred shares, Carlos S. Greeley three hundred and fifty-five shares, D. A. Chaffraix one hundred and seventy-three shares, Geo. E. Leighton one hundred shares; making two thousand two hundred and twenty-nine shares, held by defendants.

In case there were no fluctuations in prices, the ordinary margin of profit per pound was very small, less than one-eighth of a cent, and the buildings and

machinery of the company having from the long use become worn, dilapidated and antiquated, the company had for some years been considering the matter of building a new refinery, with improved machinery, so that it could the better compete with the new refineries of the eastern cities, as well as the one in San Francisco; and at the close of the season of 1880, the annual report of the president, which was mailed to every stockholder to his known address, stated as follows: "Your board of directors have under consideration the project of building a new refinery. No definite conclusion has yet been reached, but they hope to be able at an early day to lay before you for your consideration the result of their investigations and deliberations."

In 1881, the erection of a new refinery was begun. The estimate cost, made by the most expert architects in the east, was about $450,000. After the excavation for the foundation of the building was commenced, it was discovered that unfortunately the rock beneath was honeycombed, and instead of being able to build upon that rock, as was expected, it, itself, had to be quarried out to a great depth, and the cost of the excavation was $100,000 more than the original estimate therefor. This caused, also, a great delay in the building, and in making contracts for the superstructure and machinery, during which delay price of material greatly advanced; for instance, the brick in wall, which was estimated at $9 per thousand, had advanced to $14 per thousand, and other things in proportion, and with changes made in the building, machinery and apparatus, the new refinery cost, when completed, $958,024.91. The construction of the new refinery was started in 1881, and was finished the latter part of 1883. The annual report of the president, sent to each stockholder about the last of each

year, notified every one concerning the progress of the building, and the amount expended on it each year. In 1882, the loss in the business was $32,000, in 1883 the net profit of the business was $131,000.

On October 18, 1883, the board of directors passed the following resolution: "Whereas, by reason of the erection of the new refinery and to provide a working capital therefor, it is deemed advisable for this company to issue $750,000 of its bonds payable in ten years, with interest at seven per cent. payable at the Bank of America, New York City, secured by mortgage on its property: therefore, resolved, that a meeting of stockholders of this company be called for the purpose of consenting to the issue of said bonds."

A report of the stockholders made that year contains the following: "Owing to a large amount invested in the new refinery the board deem it unadvisable to declare a dividend at present. We have commenced buying sugar in New Orleans, and expect to start the new refinery in about two weeks."

During all these years the same board of directors practically were unanimously re-elected. On the second day of December, 1883, the stockholders of the company, at a meeting duly called, unanimously voted in favor of the issue of $750,000 of bonds, and the making of a mortgage to secure the same, eight thousand, two hundred and ninety-three shares of stock being voted in favor of these propositions, and none contra. In the same year the old board of directors was re-elected, and in December, 1884, this old board of directors was again re-elected, by a vote of seven thousand, six hundred and seventy-two shares, and only two shares were cast for any other persons. The bonds were issued, and the mortgage and the deed of trust securing them was executed January 31, 1884, and was recorded in the recorder's office of the city of

St. Louis on February 1, 1884. By reason of the great cost of the new refinery and necessity to have money to purchase Louisiana sugars coming into market in the late fall of 1883, which were to be used in the new refinery in 1884, the company had to raise the cash, for the terms for sugar were and are cash.

Previous to the issue of these bonds the defendants, to raise the necessary cash, entered into the following agreement:

"This agreement made this seventh day of November, A. D. 1883, between Belcher's Sugar Refining Company, Boatmen's Saving Bank and Carlos S. Greeley, Rufus J. Lackland, William A. Hargadine, Robert A. Barnes, Wayman, Crow, William Eliot Smith, George S. Drake, D. A. Chaffraix and George E. Leighton, stockholders of said refining company, among themselves, and also with said refining company and with said bank, witnesseth: That whereas it will be necessary for said company to borrow money for the purposes of its business, therefore, the said Greeley, Lackland, Hargadine, Barnes, Crow, Smith, Drake, Chaffraix and Leighton do severally and mutually agree that they will for that object for the period of one year from this date by their separate individual indorsements or notes, to be used as collateral security, and not otherwise, by said refining company, in obtaining loans, lend their credit to said company to the amount set opposite their names, as follows, to-wit: C. S. Greeley, $100,000; R. J. Lackland, $100,000; Wm. A. Hargadine, $100,000; Robert A. Barnes, $100,000; Wayman Crow, $25,000; Wm. Eliot Smith, $50,000; George S. Drake, $20,000; D. A. Chaffraix, $15,000; George E. Leighton, per A. D. Cunningham. attorney, $20,000.

"And said refining company covenants and agrees to deposit with said bank its first mortgage bonds to

the amount of $530,000, in trust, to secure said stockholders the payment to them, and any of them, by said refining company of its indebtedness to them, or any of them, that may arise by reason of anything done or performed by them, or any of them, under the agreements and provisions in this instrument contained; which said bonds are to be held and disposed of by said bank only in the manner and for the purposes herein set forth. And it is further mutually agreed by the parties hereto that upon the payment as aforesaid at any time or times, by any of said stockholders of the said refining company's indebtedness, for which he may have been liable by reason of loaning his credit as aforesaid, said bank shall at once, upon demand made by said stockholder, deliver to him an amount of said first mortgage bonds equal to the amount of said indebtedness so paid, as aforesaid, by him. And it is further understood, covenanted and agreed that any of said stockholders, parties hereto, instead of loaning his credit to said refining company by his note or indorsement as aforesaid may, at his option, in lieu thereof, loan to said refining company for the period of one year from this date, in cash, the said amount set opposite his name, respectively, as aforesaid; and take said company's note therefor, payable in one year from date, with interest thereon from date at the rate of eight per cent. per annum, and in case such loan in cash be made by any of said stockholders, the said Boatmen's Saving bank shall at once deliver to said stockholder the said bonds of said refining company to the amount of such loan so made, to be held by him as collateral security for the payment of such loan by said refining company, and such stockholder so making such loan shall not be liable in anywise upon the agreement hereinbefore contained, concerning the giving or indorsing of notes as collateral security. Any of said

stockholders, receiving any of said bonds of said refining company as collateral security, as aforesaid, may, in default of payment by said refining company of the principal indebtedness to him so secured, sell said bonds for cash at public sale, first giving thirty days' notice of such public sale by advertisements in a newspaper published in said city of St. Louis, and at such public sale he may become the purchaser thereof, and thereupon the absolute owner thereof, and out of the proceeds of such public sale he shall pay the expenses thereof, and the balance shall be applied to the payment of said indebtedness due to him. And it is further mutually agreed that if, at any time or times, said bank shall have an opportunity of selling said bonds, or any of them, so deposited with it as aforesaid for cash at not less than par, and the accrued interest to the time of such sale it shall do so, and with the proceeds thereof shall pay off, so far as can be done therewith, the indebtedness of said refining company, then owing to any of said stockholders, or for which any of them may be contingently liable by reason of anything done by them, or any of them, under or in accordance with this agreement, such payment to be made without priority or preference, but ratably, according to the amount of said indebtedness owing, as aforesaid, to any of said stockholders, or for which any of them may be contingently liable, as aforesaid, and upon such payment, as aforesaid, to any of said stockholders he shall return and deliver to said bank of said bonds by him held, if any, as collateral security, as aforesaid, an amount equal to the sum so paid him, as aforesaid.

"It is further understood and agreed that said sale or sales of said bonds by said bank, as hereinbefore provided, shall be made without any charge therefor by said bank.

"Witness the hand and seal of said stockholders, parties thereto, and the said refining company and said bank have caused these presents to be signed by their presidents, respectively, and their respective corporate seal to be affixed and attested by their secretaries, respectively.

| | |
|---|---|
| "CARLOS S. GREELEY. | [Seal] |
| "R. J. LACKLAND. | [Seal] |
| "WM. A. HARGADINE. | [Seal] |
| "ROBT. A. BARNES. | [Seal] |
| "WAYMAN CROW. | [Seal] |
| "WM. ELIOT SMITH. | [Seal] |
| "GEORGE S. DRAKE. | [Seal] |
| "D. A. CHAFFRAIX. | [Seal] |
| "GEORGE E. LEIGHTON, per A. D. Cunningham, Attorney. | [Seal] |

"BELCHER'S SUGAR REFIN-
ING COMPANY, by W. L.
Scott, President.

"Attest:    A. D. CUNNINGHAM,
                                    "Secretary.

"[Belcher' Sugar Refining Company's seal.]

"Geo. S. DRAKE, Vice-president Boatmen's Saving Bank.

"[Boatmen's Saving Bank seal.]"

All these parties except Robert A. Barnes did indorse the company's paper in the amounts respectively aforesaid, and when the company failed to pay it, each paid the above amounts, and the bonds were delivered to them respectively by the bank, in accordance with the agreement. Robert A. Barnes did not indorse the company's paper, but he loaned the company under the agreement $100,000, and afterwards $50,000 more, taking notes for it, and receiving the bonds to the same amounts as security. These bonds

bore seven per cent. interest.   Barnes loaned his money
and received his bonds in April, 1884; Lackland paid
the note on which he was indorser and received his
bonds July 15, 1884, and on the same day Greeley and
Hargadine paid their indorsed notes respectively and
received their bonds.   The others paid their notes and
received their bonds later in 1884.

Before these bonds were delivered to the respective
parties entitled to them under the terms of this agree-
ment, for the money paid to or on account of the com-
pany, the company had tried to sell them by employing
various firms of brokers, one of whom had gone to
the money centers of the east with them to make the
sale, but no sale was effected.

Under the agreement entered into between the
company and these parties and the  bank, these parties
were authorized to sell the  bonds after they  came into
their possession as collateral security, at public sale,
and from the proceeds, less expenses of sale, repay
themselves so far as possible.   But as the company and
the bank had been unable to sell these bonds, and after
they had come into the possession of the creditors of
the company under the agreement, the company's
financial condition was a great deal worse than it had
been, the public sale of the bonds would have been
absolutely ruinous to the company, because they would
have sold for little or nothing, and there would
have been little, if any, proceeds realized from the sale
to credit upon the indebtedness of the company to the
parties in interest, and therefore the bonds themselves
would have been outstanding, and the indebtedness
which they had before secured would have been unpaid.
On March 11, 1885, the following resolution was passed
by the board of directors: "Resolved, that the
Belcher's Sugar Refining Company will sell to any
parties holding bonds as collateral, said bonds so held

at par, with past due coupons attached, and coupons following for the obligations held by the respective parties, said obligations being of like amount of said bonds." And in accordance with that resolution the parties to this agreement took the bonds dollar for dollar for the amount of their indebtedness due from the company. The company was also indebted to the Boatmen's bank for about $167,000 of borrowed money.

The year 1884 was disastrous to the sugar refining business all over the country. Although the stock of raw sugars had been bought at a cheaper price than they had been sold for for twenty years, nevertheless, during 1884 the price of sugar continued to fall, and the loss on that season's business to the Belcher's Sugar Refining Company was $459,118. And on December 5, 1884, in the annual statement, the board of directors made an appeal to the other stockholders for aid, stating to them the great loss sustained, and that being unable to sell the bonds, $747,000 of the bonds issued had been used as collateral for money borrowed, and that, "Without the capital necessary to carry on a business requiring such large investments in raw sugar before it could be converted into refined sugars and sold, it is impossible to do business;" and appealed to the stockholders, to come to the aid of the company.

This statement is a history of the business from the organization of the company. An itemized statement of the cost of the new refinery is given, and the opinion was expressed that the refinery was the equal of any in the country, but that the board were no longer able to furnish means to run it and that it was necessary to run the refinery the ensuing year for the stockholders to raise at least $400,000 and that if this were done, the refinery would get on its feet again and prove a most valuable property. The stockholders did not respond to this call and the refinery had to stop for

the want of funds to carry on the business. In 1885, the holders of the bonds, secured by the deed of trust, proceeded to foreclose and the plaintiffs, Messrs. Foster and Clark, who had two hundred shares of the stock, commenced this action.

The plaintiff, Mr. Clark, did not testify but the evidence of his coplaintiff, Mr. Foster, leaves no doubt whatever, that he received the reports of the company regularly; that the secretary, Mr. Cunningham, mailed them promptly to his address in New York. There is no evidence that any of the acts of the corporation were ever concealed from any stockholder or that any of them were ever denied access to the books of the company.

I. The contention of plaintiffs that the whole issue of bonds to the amount of $750,000 was *ultra vires*, and void in the hands of all the directors and stockholders is rather unusual, under the circumstances of this case. The sole basis of this claim is that the corporation, in 1855, wrongfully issued to Belcher & Bro. all the stock in excess of $500,000. Whether plaintiffs' stock is a part of that excess does not appear, neither does the evidence disclose that it is a part of the first $500,000 of stock issued. But after all parties had bought, and dealt with this stock for thirty years, as valid, and had received annual dividends upon the whole issue for all those years without any intimation that its validity would be challenged, we have no hesitancy in saying that it is too late now to raise that question, and laches alone would bar a recovery on that ground.

But the evidence is overwhelming that when Belcher & Bro. sold their refinery to the corporation in 1855, they were to have stock to the amount of the *appraised value*, and that they received stock to the amount of that appraisement. The fact that prior to the appraisement, the secretary was authorized to issue

to them $500,000 worth, because as the record recites, the directors were "*satisfied* that the property conveyed to the company was *of greater value*" than the $500,-000, is no evidence whatever that either Belcher & Bro. or the directors considered that issue as a waiver of the amount the appraisement would show, or as an agreement to take that sum, in lieu of the amount stipulated for in the contract of sale. It was simply ordered to be issued in anticipation of the final amount. That we are right in this view, is fully sustained by the proceedings of the board on March 12, 1855. The record shows that Messrs. Gaty and Palm, the appraisers, had not been notified of any settlement that would dispense with their appraisement. On the contrary, they proceeded to value the property, and made return that it was worth $922,613 and thereupon, the previous order of February 6, 1855, to issue $500,000 of stock to Belcher & Bro. was rescinded, and stock to the amount of $922,613 was directed to be issued to them. The fact that this refinery earned dividends to the amount of $1,740,000, or an average of six per cent. per annum upon the par value of the whole issue, for twenty-five years, certainly in no way indicates that the appraisement was fraudulent or collusive.

The stock having been issued to the amount of $1,000,000 in 1855, upon a consideration that stood for thirty years, unimpeached and unquestioned, the charge that the indebtedness exceeded the amount of capital stock actually paid in, as provided by the laws of 1845, in force when the company was organized, is without any basis whatever. We do not understand counsel to claim that the stock might not be paid for in property as a fair and honest valuation, for this is no longer to be questioned in this state. *Garrett v. Coal Mining Co.,* 113 Mo. 330; *Liebke v. Knapp,* 79 Mo. 24; *Schickle v. Watts,* 94 Mo. 414; *Chouteau v. Dean,* 7 Mo. App. 210.

II. Much of the brief of counsel for appellants is devoted to a consideration of the relation the defendants, who are directors and stockholders, bore to this company and the other stockholders. Without discussing each head separately, it is perhaps sufficient to say that he asserts they sustained the relation of trustees; that they must have acted in good faith, and will not be allowed to profit by a breach of trust. Before we enter upon a discussion of facts, it is well to say that we regard it as settled law in this state, that while a director of a corporation does occupy fiduciary relations in his dealings with the subject-matter of his trust, and with the stockholders whose property is confided to his care, and all his dealings as such are scrutinized with great jealousy, yet this court has never held that a director might not, in good faith, loan his money to the corporation for the legitimate purposes of the corporation, and hold it a valid claim against the corporation. Such a rule would often deprive the corporation of the aid and assistance of those most vitally interested in its welfare, and best able to judge of its necessities. *Lingle v. Ins. Co.*, 45 Mo. 110; *Kitchen v. Railroad*, 69 Mo. 224; *Chouteau Insurance Co. v. Floyd*, 74 Mo. 286; *Foster v. Planing Mill Co.*, 92 Mo. 79; and in this ruling this court is in harmony with the supreme court of the United States. *Oil Co. v. Marbury*, 91 U. S. 587; *Richardson's Executor v. Green*, 133 U. S. 30. Satisfied that this rule is rigid enough to protect the corporation and its stockholders and creditors on the one hand from the bad faith, or fraud of its managing officers, and yet not so rigid as to deprive the corporation of their assistance when granted in good faith, we see no reason for adopting another or more stringent one.

Tested then by this measure of accountability, what is there in the conduct of these defendants that would

justify a court of equity in denying to them a repayment of the five hundred and thirty thousand dollars, they advanced out of their own private fortunes to complete the construction of the new refinery, and equip it with necessary machinery, to enable it to refine sugars and compete with eastern and California refineries. That they furnished these moneys is beyond all cavil, but it is argued that their sole purpose was to wreck the corporation; that they advanced all this money simply to get possession of the property. We think this argument is based purely upon an assumption unsupported by the evidence, and contrary to all those legitimate inferences that may properly be drawn from the acts and conduct of men. Why, for instance, should Mr. Barnes, who owned one thousand and twenty-nine shares of this stock, be charged with a desire to destroy this stock, simply because he was willing to and did loan the company outright, on its notes, $150,000. But it is said they did this to get the bonds into their hands; but if that was their purpose, why should these men have put it entirely in the power of the Boatmen's bank, from which they obtained the money (all except Mr. Barnes) to sell these bonds and pay off the indebtedness of the company? Their well known capacity as business men forbids us to indulge the presumption that they were ignorant, that by their contract they were paving the way to deprive themselves of the fruits of their conspiracy, if possession of the bonds was their ultimate and ulterior purpose.

But not only might the bank have sold the bonds and thwarted their scheme, but they were confronted with another danger. The profits of the old refinery in 1883, were $131,680.00. If this record discloses anything, it seems to us, that it demonstrates that no one could foresee the sugar market for months in advance. Without any knowledge then, of the disas-

trous season of 1884, might not these directors and stock-holders who were advancing this money, well have anticipated that with the splendid facilities of their new refinery, the profits, with a small advance on sugar, might run up to a half million dollars? Certainly, it was much more reasonable in view of the profits of 1883, than the collapse of 1884, but if they had had a prosperous year in 1884, the company could have retired its bonds and blighted their hopes of obtaining them.

But all this is upon an assumption that these men were venal; that they were unworthy the standing that they had acquired in St. Louis by lives of business integrity, and this court will not proceed on such a theory; on the contrary, where the acts of litigants comport as well with fair dealing and good faith, they are entitled to the presumption that they were guided in their conduct with a desire to benefit those for whom they were acting. We think there is absolutely nothing in this record to show that one dollar of the $530,000 loaned by the defendants to the corporation, was other than an honest loan for the sole purpose of enabling this corporation to subserve the purposes of its creation.

III. The charge of actual fraud is grounded not upon any one act, because it would seem that counsel inferentially admits, that when the various and several acts of the defendants are separately examined, they will not sustain the charge, but he argues that a combination of all these circumstances which led up to the failure of the corporation and foreclosure, disclose a case of fraud. In this we find ourselves unable to agree with him. We see nothing in this record but an unfortunate failure of a most deserving enterprise. The directors of this refinery were not novices; they were men of large experience; they had conducted this refinery through seasons of prosperity and adversity;

had maintained it alike, in war and peace; had brought
it safely through the panic of 1857 in its infancy, and
successfully weathered the panic of 1873; the charge
that it was gross negligence to embark in the project of
enlarging its plant in 1880, to enable it to compete
with the refineries of California and the eastern states,
is based entirely upon a retrospect. Viewed from their
standpoint, it had been rendered necessary, even essen-
tial to their existence, from the fact that after twenty-
five years of use, their buildings and machinery had
become worn, dilapidated and antiquated. They reasoned
that St. Louis occupied an advantageous position for
a refinery, between the two rivals on the coasts; the
good will of the company was a valuable property, and
the success of former years might well encourage them
to hope for prosperity in the future. They did not
proceed blindly as charged. They had an architect
make estimates; had these estimates not proven too
low, it is exceedingly probable that the company would
not have failed, but more than this, they could not
foresee the great loss and delay that was in store for
them from the faulty foundation. The loss of $100,000
from this source alone was greatly augmented by the
delay, during which material advanced greatly in price.
The evidence simply tends to show that they were
unfortunate in the site selected, but this was a mistake
in business judgment only and not fraud. Notwith-
standing the excess in cost over the estimates, the
refinery might still have gone forward but for the loss
of nearly a half million dollars on the business of 1884,
a loss caused by the unexpected and unprecedented fall
in the price of sugar.

Of all the acts of these directors the stockholders
were regularly advised. They did not object at any
time to the building of a new refinery. The plaintiffs
holding two hundred shares of ten thousand of this

stock, alone complain of the management.   The stock-holders were offered a chance to advance money to con-tinue its operation, but declined to do so.   These defendants owned about one-fifth of all the stock; they brought their means to the aid of the corporation; they received in return the bonds of the corporation at par for the exact amount they loaned it.   There is no evi-dence that they ever exacted or received a dollar even in securities, in excess of the face of their several debts. On the other hand they took these bonds at par, when it had been demonstrated they could not be sold on the markets for that sum.

Finally, instead of any evidence of fraud appearing in the dealings of these defendants, we think it can very properly be said of them, as was said in *Chouteau Ins. Co. v. Floyd*, 74 Mo. 292.   "It is a duty of the directors to provide for the payment of the liabilities of the corporation, and they are entitled to commendation rather than deserving censure, if, of their own means, they pay its debts when its treasury is depleted."

The findings and decree of the circuit court are amply sustained by the record, and the judgment is affirmed.   All concur.