## BANK OF FORT MADISON *v.* ALDEN.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

No. 853. Submitted January 4, 1889. — Decided February 4, 1889.

A stockholder in an insolvent corporation, who has paid his stock subscription in full by a transfer of a tract of land, in good faith, at an agreed value, for the use of the company's business, is not liable in equity to a creditor of the corporation who had knowledge of and assented to the transaction at the time when it took place, solely upon the ground that the land turned out to be of less value than was agreed upon.

The doctrine that the distribution of a trust fund of a corporation to the individual stockholders upon their resolution does not deprive a creditor, not consenting thereto, of his right to compel the application of the fund to the payment of the debts of the corporation, cannot be invoked by a creditor who is a stockholder consenting to the distribution and participating in the appropriation.

An indorsement of the note of a third party by one member of a partnership in the firm's name, by way of security to a bank, without the knowledge or consent of the other partner, cannot be enforced as a liability against the estate of the latter after his decease.

---

Opinion of the Court.

In equity. Decree dismissing the bill; complainant appealed. The case is stated in the opinion.

Mr. *Henry Strong* and Mr. *Theodore Sheldon*, for appellant, cited: *Wellman* v. *Howard Coal and Iron Works,* 19 Fed. Rep. 51; *Wood* v. *Dummer,* 3 Mason, 308; *Fiske* v. *Hills,* 11 Bissell, 294; *Bank of St. Mary* v. *St. John,* 25 Alabama, 566; *Rey* v. *Simpson,* 22 How. 341; *Good* v. *Martin,* 95 U. S. 90: *Bendey* v. *Townsend,* 109 U. S. 665, 667; *Irwin* v. *Williar,* 110 U. S. 499; *Mason* v. *Tiffany,* 45 Illinois, 392; *Doggett* v. *Dill,* 108 Illinois, 560; *Walden* v. *Bodley,* 14 Pet. 156; *Rose* v. *Mynatt,* 7 Yerger, 30; *Maury* v. *Lewis,* 10 Yerger, 115; *McLaughlin* v. *Daniel,* 8 Dana, (Ky.) 182, 184; *Deatly* v. *Murphy,* 3 A. K. Marsh, 472, 474.

Mr. *John P. Wilson*, for appellees, cited: *Coit* v. *Gold Amalgamating Co.,* 119 U. S. 343; *Foster* v. *Goddard,* 1 Black, 506; *Carneal* v. *Banks,* 10 Wheat. 181; *Simms* v. *Guthrie,* 9 Cranch, 19; *Rubber Co.* v. *Goodyear,* 9 Wall. 788, 793; *Des Moines Gas Co.* v. *West,* 50 Iowa, 16; *Terry* v. *Anderson,* 95 U. S. 628, 636; *Singer* v. *Carpenter,* 125 Illinois, 117.

Mr. Justice Field delivered the opinion of the court.

The Bank of Fort Madison, the complainant below, the appellant here, is a corporation organized under the laws of Iowa. The defendants are executors of the will of James S. Waterman, deceased, who, at the time of his death, was a citizen of Illinois. The bank is a creditor of a corporation created under the laws of Wisconsin, known as the Black River Lumber Company, in the sum of $58,505.53, with interest from January, 1884. Waterman was a stockholder in the company, and the present suit is brought upon the allegation that, at the time of his decease, he was indebted to it in a large amount for stock subscribed, which had been issued to him, but for which he had never paid, except in lands not exceeding in cash value forty per cent of the amount subscribed, and which lands have been reconveyed to him. The object of the suit is

to compel the executors to pay out of his estate the amount of his alleged unpaid subscription, so far as may be necessary for the satisfaction of the claim of the bank. In addition to this, the complainant alleges an indebtedness of the estate of Waterman upon a promissory note of the Lumber Company to the amount of $10,000, which was indorsed by the firm of Ketchum & Waterman, of which the deceased was a partner. The court below decided against the claims of the bank and dismissed the bill. From its decree the case is here on appeal.

It appears that on the 17th of October, 1879, five persons residing at Fort Madison, Iowa, namely, Charles Brewster, Joseph A. Smith, William H. Kretzinger, Samuel Atlee and J. C. Atlee, were the owners of a tract of "pine land" in Wisconsin, amounting to about 13,000 acres. At the same time the firm of Ketchum & Waterman, consisting of Henry Ketchum and M. M. Ketchum and James S. Waterman, were owners of a tract of similar land in that State, amounting to about 30,000 acres, which was subject to a mortgage for $75,000. On that day, these eight persons entered into an agreement in writing to form a corporation under the laws of Wisconsin, to be designated the "Black River Lumber Company, for the manufacture and sale of lumber, logs, and timber," and such other business as might be included in its charter, and to contribute and convey to a trustee or trustees, for the benefit of the company, under certain restrictions, the first tract mentioned, and 25,000 acres of the second tract. The company was to assume and pay all the deferred instalments of the purchase money on this last tract as they matured, and the Ketchums and Waterman were to advance the necessary funds to take up the notes given, which amounted to $25,000, besides interest, and to receive the note of the company for the amount, payable, with eight per cent interest, on or before July 1, 1880, which they were to hold as a lien on the premises.

It was also agreed, by the same instrument, that the parties residing at Fort Madison, owners of the 13,000-acre tract, should have three-sevenths of the stock of the company, and that the Ketchums and Waterman should have four-sevenths

- - such stock to be received by them in full payment for their conveyances to the trustee. Each party was to receive stock in proportion to his individual interest in the lands.

Pursuant to this agreement the Black River Lumber Company was, in November, 1879, incorporated under the laws of Wisconsin — the capital stock being fixed at $437,500, divided into 4375 shares of $100 each. The parcels of land mentioned above were conveyed by the respective owners to Joseph M. Beck, of Fort Madison, in trust for the company, upon certain conditions, and to the parties shares were issued as follows: To James S. Waterman, 1250 shares; to H. Ketchum, 625 shares; to M. M. Ketchum, 625 shares; to J. C. Atlee, 468 shares; to S. Atlee, 469 shares; to Charles Brewster, 235 shares; to W. H. Kretzinger, 468 shares; to Joseph A. Smith, 235 shares. No money was paid by any of the parties for the stock, the land conveyed by them to the trustee being taken in full payment of their respective shares.

As stated above, the tract held by the Ketchums and Waterman was subject to a mortgage of $75,000 of the purchase money, and the trust upon which they conveyed the 25,000 acres to the trustee was, that upon the payment of the said purchase money and interest and the taxes thereon, he should convey the lands to the Black River Lumber Company according to the conditions of the contract of October 17, 1879.

As no money was paid by the stockholders for their stock, the company had no funds with which to commence business. To meet this condition the contract of October 17, 1879, provided that the parties residing at Fort Madison should advance from time to time, as the company might require funds, three-fourths of $27,260.42, that is, the sum of $20,445.30, and take the note of the Black River Lumber Company for the amount. Upon this note indorsed by those parties, the amount was borrowed from the Bank of Fort Madison. When this was exhausted the Lumber Company on various occasions borrowed money from the bank, upon its notes, indorsed by different stockholders, until some time in March, 1880, when the loans thus made amounted to $65,000. Of this sum, $10,000 had been loaned upon a note of the company indorsed by the firm

name of Ketchum & Waterman. The indorsement was made by Ketchum, without any authority except that supposed to exist from his partnership in the firm. The bank then refused to make any further advances without additional security to cover existing as well as future loans. A chattel mortgage was thereupon executed to the bank by the Lumber Company upon all its logs and lumber, to secure such advances as well as other debts of the company. The bank immediately took possession of the property and made further advances to the amount of $20,000.

On the 8th of April following, the two Ketchums filed a bill in a state court of Wisconsin to set aside this chattel mortgage, making the bank, the company, and all its stockholders, except Waterman, parties, and alleging that the mortgage was a fraud upon the company; that the amount claimed by the bank was not due to it; and that the company owed a large amount, but had sufficient assets to pay all its debts. The bill prayed that the mortgage be declared invalid; that the property of the company be restored to it; and that, pending the suit, a receiver of the property be appointed. Soon afterwards a stipulation was entered into by all the parties, that one William R. Sill be appointed by the judge of the court receiver of the property and effects of the company, and that, in addition to the usual powers of such officers, he receive authority to manage and control the property and dispose of the same in the customary course of trade, for cash or on credit, and apply the proceeds to pay the debts of the company, and when they were paid that he be discharged, and so much of the property as might be undisposed of be returned to the company; that the receiver give security for the faithful discharge of his trust in the sum of $25,000; and that as soon as he had been appointed, and this security given, the chattel mortgage, executed to the bank, should be cancelled, and M. M. Ketchum, who was general manager of the company, should turn over and deliver to him all its property and effects. An order was made by the court in accordance with this stipulation.

When the first note given for the purchase money of the Ketchum and Waterman tract became due, Waterman ad-

vanced the money to take it up, receiving in lieu of it the note of 'the Lumber Company, payable on or before July 1, 1880. After this latter note had matured he passed it over to one Milo Smith, who recovered judgment upon it against the Lumber Company. The receiver was authorized to pay all demands against that company, which he did, except those of the bank and this judgment in favor of Milo Smith.

In April, 1881, at a meeting of the stockholders of the Lumber Company, it was resolved that the trustee should reconvey the lands he held to the respective stockholders who had transferred them to him, except that the lands transferred by the Ketchums and Waterman should be conveyed to Waterman alone. To this arrangement the Ketchums assented. It was also agreed that the judgment of Milo Smith should be released as a lien on the lands to be reconveyed to the parties residing at Fort Madison, and should be collected only out of the lands to be reconveyed to Waterman. This arrangement was carried out in 1882, but modified, at the request of the directors of the company, by the trustee conveying the lands to the Lumber Company, and that company simultaneously conveying the same to the original owners as above directed. Milo Smith's judgment was released as to the lands conveyed to the parties at Fort Madison, and as to the funds in the hands of the receiver. This disposition of the lands was made upon the belief, which all parties at the time appeared to entertain, that there would be sufficient money realized from property in the hands of the receiver to pay the demands of the bank in full. As the property consisted principally of logs and timber scattered over a large extent of territory, it was impossible to make any accurate estimate of its value. The suit was removed to the Circuit Court of the United States, and resulted in a final decree on the 15th of January, 1884, which adjudged that there was due by the Lumber Company to the bank the sum of $72,366.14, and directed the receiver to turn over to it certain property and credits in his hands, leaving a balance due of $58,505.53. The receiver was thereupon discharged.

James S. Waterman died on the 19th of July, 1883, and the

defendants below, appellees here, were appointed executors of his last will and testament.

The present suit is brought to enforce the payment of the balance thus adjudged to be due to the bank by the Lumber Company, out of the estate of the deceased. The bill was framed upon the theory that the deceased was at the time of his death indebted to the company in a large amount for the stock issued to him, it being contended that the cash value of the lands conveyed to the trustee for that stock did not exceed forty per cent of the amount subscribed. But this theory falls to the ground before the facts of the case, as detailed above. The parties who became stockholders had, pursuant to a previous agreement, conveyed their lands to a trustee, in trust for the corporation formed, upon an understanding that stock should be issued to them in proportion to their individual interests in the property. The subscription was made upon this arrangement and the parties acted with full knowledge of the conditions on which the property was to be transferred to a trustee, and the stock was to be issued to them. There was no attempt to pass off the property as different or more valuable than it was. There was no deception or misrepresentation of any kind in the case. No demand, therefore, against the estate of the deceased Waterman can be sustained, upon the assumption that by the conveyance of his land he had not paid up all that he contracted or was bound to pay by his subscription. There was no credit given by the bank to the company upon any representation of a different set of facts than that which actually existed. The bank was owned by two of the stockholders of the company, Brewster and Smith, who had participated in and had been well advised of all that was done by the company. They held all the shares of the bank, and were respectively its president and cashier. Such being the case, the answer to the claims of the bank is found in the decision of this court in *Coit* v. *Gold Amalgamating Co.*, 119 U. S. 343, 345. There the holder of a judgment against the corporation, being unable to obtain its satisfaction upon execution, and finding the company was insolvent, brought suit to compel the stockholders to pay what he claimed to be due and

unpaid on the shares held by them.    He contended that the valuation put upon the property taken for such stock was illegally and fraudulently made at an amount far above its actual value, but the court said: "If it were proved that actual fraud was committed in the payment of the stock, and that the complainant had given credit to the company from a belief that its stock was fully paid, there would, undoubtedly, be substantial ground for the relief asked. But where the charter authorizes capital stock to be paid in property, and the shareholders honestly and in good faith put in property instead of money in payment of their subscriptions, third parties have no ground for complaint.    The case is very different from that in which subscriptions to stock are payable in cash, and where only a part of the instalments has been paid.    In that case there is still a debt due to the corporation, which, if it becomes insolvent, may be sequestered in equity by the creditors as a trust fund liable to the payment of their debts.    But where full paid stock is issued for property received, there must be actual fraud in the transaction to enable creditors of the corporation to call the stockholders to account."   Under this authority no foundation is laid for calling upon the estate of the deceased to pay anything more for the stock issued to him than was paid.

But assuming this to be the correct doctrine, so far as any alleged difference between the subscription and the value of the property taken in payment is concerned, it is contended that the lands, which, in the hands of the trustee, constituted a trust fund for the benefit of the stockholders and creditors of the company, were not divested of their trust character upon their reconveyance to the stockholders; that the only effect of the reconveyance was to substitute several trustees in place of one, and that the appellant has therefore a right to proceed against either or all of them for an accounting.    If this were a suit by a creditor other than a stockholder there would be great force in this position of the appellant.    It might be well contended that a conveyance of the trust fund to the stockholders upon their resolution could not deprive a creditor, not consenting thereto, of his right to compel the application of

that fund to the payment of his demand, or of a ratable proportion with other creditors. But the right to compel such application cannot be invoked by a stockholder consenting to such disposition of the trust fund, and himself participating in its appropriation, as in the present case. Here the lands conveyed to the trustee were subject, as stated above, to a mortgage of $75,000, and its payment was assumed by the company. It turned out that the company was not prosperous in its business, and in the year following its organization it became involved in litigation, and a receiver of its property and effects was appointed. And in April, 1880, its stockholders upon consultation came to the conclusion that it would be impossible for the company to comply with its engagement to pay off that mortgage, and they therefore advised, and at their meeting resolved, that the lands should be reconveyed to the original owners, and the company be thus released. The bank, through its stockholders, who were also stockholders of the Lumber Company, united in this advice and resolution, and in pursuance thereof the several reconveyances were made, as stated above, and among others to the stockholders of the bank. It was expected that the original owners would then hold the lands as they had held them before the Lumber Company was organized. That the property when reconveyed was sold by the holders at prices which, if the company could have obtained them, would have made its retention advisable, does not alter the transaction. The case of *Thompson* v. *Bemis Paper Co.*, 127 Mass. 595, supports this conclusion. There a judgment creditor of the corporation, unable to enforce his judgment by execution, filed a bill in equity on behalf of himself and all other creditors, against the corporation and certain stockholders, to enforce a personal liability of the latter, on the ground that the capital of the corporation had been withdrawn and paid to the stockholders. He had at that time contracted for eight shares of the stock, paid for them in part, and voted as owner at meetings of the stockholders. At one of the meetings the sum of $16,528, being the amount of the cash assets of the corporation, was withdrawn from the capital of the corporation and divided among

the stockholders in proportion to the amount of stock held by them respectively. The plaintiff was present and voted in favor of the division. Upon these facts it was held that the bill could not be sustained, although upon its filing the plaintiff was the absolute owner of the eight shares; and that he could not make the act which he had favored and voted for a ground for charging the stockholders with a personal liability for a debt due from the corporation to himself.

The indorsement of the note of the Black River Lumber Company for $10,000, by Ketchum in the firm name of Ketchum & Waterman, was made by way of security to the bank for its loan to that company. The transaction had no connection with the business of the firm. It was a guarantee of another's obligation which no member of the firm had any authority to give. It was not shown, moreover, that the indorsement was made with the consent or even knowledge of Waterman. His estate, therefore, cannot be held liable upon the note.

*Decree affirmed.*