NORTHWESTERN MUT. LIFE INS. CO. v. COTTON EXCHANGE REAL–ESTATE CO. et al.

(Circuit Court, E. D. Missouri, E. D.   October 21, 1895.)

No. 3,509.

1. CORPORATIONS—STOCK SUBSCRIPTIONS—PAYMENT IN REAL ESTATE.
   A purchaser of stock in a Missouri business corporation may pay therefor in real estate, subject always to the scrutiny of the courts into its honesty, as to the valuation placed on the real estate. If this valuation be fixed in good faith, although it should subsequently transpire to have been greatly excessive, the courts will not disturb the arrangement.

2. SAME—OVERVALUATION.
   To authorize the interference of the court on the ground of such overvaluation, it must be made to appear that it was willfully done, or so grossly excessive as to impeach its integrity.

3. SAME—ESTOPPEL.
   Although such real estate taken in exchange for such stock may have been so fraudulently overvalued, yet if a creditor of a corporation, at the time he gives the credit, knows of the valuation placed by the parties on the real estate, and the circumstances attending the transfer, he will,

in case of the insolvency of the corporation, be estopped from maintaining an action against such stockholders for the excess of such valuation.

4. SAME—INSOLVENCY—PREFERENCE OF DIRECTORS.

In case of the known insolvency of a business corporation, when it cannot proceed further in carrying out the objects of its creation to do business as a corporation, its managing board of directors ought not to be permitted to take advantage of their position as quasi public servants to appropriate to themselves the remaining assets of the corporation in satisfaction of unsecured debts in their favor, to the exclusion of all other general creditors.

(Syllabus by the Court.)

Bill by the Northwestern Mutual Life Insurance Company against the Cotton Exchange Real-Estate Company and the directors and stockholders therein.

Between 1875 and 1878, William L. Black, one of the respondents,—a cotton commission merchant and general speculator,—conceived the project of erecting a large building in a part of the city of St. Louis which, prior to about 1875, was the business center of the city; but the tendency of trade and commerce to other parts of the city had greatly depreciated real estate in the given locality. His scheme was to bring back this trade and business to its old anchorage. Accordingly he bought a site for the proposed building, at a cost of about $25,000. Shortly afterwards he failed in business, and, unable to carry out his scheme he induced the respondents William T. Wilkins and Leonard Mathews to come into the undertaking; and with him they organized a business corporation, under the state laws, known as the St. Louis Cotton Exchange Building Company, designated hereafter the "Building Company," with a capital stock of $50,000, divided into shares of $100 each, and about equally distributed among said parties. Thereupon Black transferred to this corporation said building site for the nominal consideration of $40,000,—$10,000 in cash, and $30,000 in the bonds of the company. In order to cover said bonds, and raise $20,000 to lift incumbrances on said property, and aid in the erection of said building, in March, 1881, the company issued $50,000 in bonds secured by deed of trust on said property. The evidence shows that said Black, as further inducement to said Wilkins and Mathews to enter into said undertaking, turned over to each of them $10,000 of said bonds. He had also succeeded, while working up his scheme, in obtaining, by way of bonuses from persons owning real estate in that locality, subscriptions amounting to $40,000, which were turned over to the corporation. After the company had proceeded in the erection of said building to a point where only about $8,000 or $9,000 were required to complete it, the stockholders and directors, who were one and the same, conceived the project of organizing another corporation, with a capital stock of $125,000, with like purposes of the first, and transferring to the new company the property and good will of the old company. This charter was obtained about March 30, 1882, under the corporate name of the Cotton Exchange Real-Estate Company. The capital stock of $125,000 was divided into 1,250 shares, of $100 each, one-half of which was certified by the stockholders to have been paid in cash. But the matter was arranged substantially as follows: The real estate and building were valued in the transfer at $200,000, of which $125,000 was called cash, and the remaining $75,000 was paid in bonds of the new company, which were divided among the three stockholders. The $125,000 so-called cash payment was thus paid by the transfer of the real estate. William L. Black, before the consummation of this reorganization scheme into a new company, failed in business, and to liquidate his indebtedness to the other respondent, A. G. Black, his brother, residing in the city of New York, all of his stock in the old company was transferred to A. G. Black, except one share, which was retained by William L. Black to enable him, as a resident of the state, to act as director of the corporation in the place of A. G. Black. When the stock was issued in the new concern, and the $75,000 bonds were issued, the same was issued and held in the name of the other respondent, Silas B. Jones, in trust for the benefit of said A. G. Black; the said William

L. Black continuing to hold a share of stock in the new company to enable him to act as director, but which in fact belonged to A. G. Black. The $75,000 of bonds aforesaid were sold to the complainant, a nonresident corporation. In 1887 the real-estate company defaulted in the payment of interest on said bonds; and in April, 1888, the deed of trust given by the company on said building to secure their payment was foreclosed, and at the sale thereunder the complainant became the purchaser, at the price of $50,000, leaving at that time about $30,000 of the debt unsatisfied. The plaintiff obtained judgment against the corporation for the balance of said debt, amounting at the date of rendition to about $35,000. After return of nulla bona on the execution issued thereon, the complainant brought this suit to recover from the stockholders the amount of said judgment. The bill counts upon two principal grounds of recovery: First, that the defendant stockholders had not fully paid up the amount of their stock subscribed; and, second, that the defendant directors and stockholders, after they knew the corporation was insolvent, appropriated its remaining assets to the payment of unsecured debts claimed by them against the corporation, thereby preferring themselves, as creditors, to the exclusion of all other creditors of the corporation.

Lee & McKeighan, for complainant.
Pollard & Werner and Silas B. Jones, for defendants.

PHILIPS, District Judge (after stating the facts). Three principal questions arise on this record: Was the real estate transferred by the directors of the old Exchange Building Corporation to the Cotton Exchange Real-Estate Company overvalued to a material extent; and, if so, was it so done knowingly? (2) If the property was so overvalued, did the complainant, purchaser of the bonds in question, at the time of purchase, have such information of the valuation placed by the directors on the property, and thereby take the bonds under circumstances to create an estoppel in favor of respondents? (3) Did the directors apply to their own use, by way of preference, assets of the corporation, after knowledge of its insolvency and inability to proceed further in execution of the purposes of its creation?

1. It is not essential, in view of the conclusions reached by the court on the second proposition, to enter into any extended discussion of the facts bearing on the first, further than to say that I should feel some embarrassment in answering the question as to whether, under all the facts and circumstances attending the transfer by the directors from themselves to themselves of the property in question, they did not greatly overvalue it, to such an extent as to make its fairness seriously questionable. The law seems to be well settled, in this jurisdiction, that a purchaser of stock in a corporation may make payment therefor in other property than money. It exacts, however, the qualification of good faith on the part of the contracting parties. It does not admit of any deception or evasion in this method of payment. Good faith and honesty of purpose are the tests. If the real estate transferred for the stock in the new corporation was honestly believed by the parties to the transaction to be equivalent in value to the face of the stock issued, a creditor of the corporation may not assail the transaction, although it should subsequently transpire that the property in fact was overvalued. Foster v. Refining Co., 118 Mo. 238, 24 S. W. 63; Coit v.

Amalgamating Co., 119 U. S. 343, 7 Sup. Ct. 231; Burke v. Smith, 16 Wall. 390; Bank v. Alden, 129 U. S. 372, 9 Sup. Ct. 332; Northwestern Mut. Life Ins. Co. v. Cotton Exchange Real-Estate Co. (demurrer in this case) 46 Fed. 22.

2. Waiving this branch of the case, the complainant is confronted with the serious fact that, when it became the purchaser of the bonds, it was advised of the valuation placed on the property by the directors, and was in possession of other important facts, which, if pursued, would have led to full knowledge of the method pursued by the directors in the said transfer, the fixing of the valuation, and the manner of payment of the cash subscription.

> "It is a settled rule that a person who deals with a corporation must, at his peril, take notice of its charter, or articles of association. The rule does not rest upon the ground that a charter or general corporation law is a public statute, of which all persons are deemed to have notice. It is a rule based upon no technical doctrine, but upon the necessity of the case. It applies to foreign corporations as well as domestic corporations, and to corporations chartered by private acts of the legislature as well as to those whose charters are part of the general law." 2 Mor. Priv. Corp. (2d Ed.) § 591.

Printed conspicuously on the back of the bonds purchased by the complainant are the following recitations:

> "That whereas, the said Cotton Exchange Real-Estate Company is a corporation duly incorporated under the laws of the state of Missouri for the purpose, among other things, of purchasing from the St. Louis Cotton Exchange Building Company the property hereinafter described, with full power in the said Cotton Exchange Real-Estate Company to do any and all acts proper and convenient for making said purchase; and whereas, at a meeting of the stockholders of said Cotton Exchange Real-Estate Company held at its office, in the said city of St. Louis, on the 10th day of April, A. D. 1882, at which all the stockholders of said Cotton Exchange Real-Estate Company were present, and signed a written consent thereto on the record of said meeting; and whereas, at a meeting of the board of directors of said Cotton Exchange Real-Estate Company, at which all the directors were present, held at the same time and place, it was unanimously resolved, as well by the said meeting of stockholders as by the said meeting of the board of directors, that said Cotton Exchange Real-Estate Company would purchase the property hereinafter described, from the St. Louis Cotton Exchange Building Company, for the sum of two hundred thousand dollars, to be paid as follows: One hundred and twenty-five thousand dollars in cash, and the balance—seventy-five thousand dollars—in bonds payable to bearer, and to be executed by the said Cotton Exchange Real-Estate Company."

By said recitations the purchaser was advised that the new corporation was organized, inter alia, for the very purpose of purchasing from the building company the real estate in question; also, that the two concerns had placed upon their minute books and records the transaction, and that the valuation placed on this property by these directors, trading with themselves, was $200,000. True it is that the bond recites that $125,000 of this sum was to be paid in cash, and the balance—$75,000—was to be paid for by the issue of the bonds in question. The essential fact, however, remains,— that the purchaser of the bonds was notified in advance that the valuation placed upon this real estate, in the transfer, was $200,000. While it may be conceded that the recitation that the new company was paying $125,000 in cash to the old company was calculated to

augment the value of the realty to an innocent purchaser, yet it is hardly conceivable that the complainant should not have reasonably understood that it would have been but an idle ceremony for the new company to pay over to the old the sum of $125,000 · in money, when this money, or its representative, was in fact all the while, by whatever name called or by whatever formula gone through, necessarily in the same hands of the same stockholders and the same managing officers. Knowing, then, as the purchaser did, that these managing officers and interested stockholders estimated the real estate at $200,000, in the transaction, it cannot claim that there was any concealment or misrepresentation in respect to the valuation. Being fully advised thereof, it was put upon inquiry, with a wide field for its pursuit. · More than this, the evidence shows that, not relying altogether upon matters apparent of record, nor upon any representations in pais, the complainant, before completing the purchase of the bonds, sent from its principal office, at Milwaukee, Wis., its own trusted agent and vice president, Matthew Keenan, to make personal examination of the property, and who presumably made report thereon of his own estimate. And it is a significant fact that the complainant has not seen fit to take the deposition of this important witness touching this issue, although stress was laid upon his visit and inspection, by the defendants, in taking depositions on their behalf. Mr. Dwight Durkee, who was quite familiar with this property, and the fact that it was transferred from the old to the new company, and who had an office with one of the defendant stockholders and active participants in the transaction in question, and who acted for the complainant somewhat in the capacity of a solicitor, in making the purchase of the bonds, and who acted for the purchaser, as one of the appraisers of the property, prior to the purchase of the bonds, placed a valuation on the property of $150,000. While it cannot be said, as matter of law, that Mr. Durkee sustained such relation to the complainant that his knowledge is imputable to it, his relation to the transaction may nevertheless be regarded as a link in the chain of circumstances to show two important facts: (1) That the complainant knew before it took the bonds what valuation the directors had placed on the real estate; and (2) that the company did not wholly rely upon the fairness of the valuation fixed by the interested parties, but upon information derived through its own representative, and other sources. It may, therefore, well be said that the complainant not only bought with its eyes open, as to the price agreed upon by the directors, but assented thereto after independent investigation. This being the state of facts, the law is that notwithstanding any overvaluation of the property taken in payment of stock, and notwithstanding any guilty knowledge thereof the parties to the contract may have had, a court of equity will not aid the complainant to escape the result of its own neglect or overconfidence. Coit v. Amalgamating Co., supra; Bank v. Alden, supra; Phelan v. Hazard, 5 Dill. 45, Fed. Cas. No. 11,068; opinion of Thayer, J., on demurrer in this case.

3. The remaining question to be determined is, should the defend-

ants be held to account for certain moneys claimed to have been applied by them, as directors, to the payment of debts in their favor against the corporation? We are met at the very threshold of this branch of the case with the contention that, no matter what the facts are respecting these payments, it is, as matter of law, indifferent whether or not the corporation, at the time of these payments by the directors to themselves, was insolvent, and known to them to be incapable of longer "acting up to the end of its design," as required by law. Counsel for defendants broadly proclaim that until a private corporation is either placed in the hands of a receiver, or the statutory steps are taken for winding up its affairs on declared dissolution, its directors may apply its assets to the satisfaction of any and all unsecured claims held by themselves against it, to the exclusion of all other general creditors. The only authority claimed to support this extreme doctrine is the supreme court of the state of Missouri. It is claimed that it has recently decided that, so long as the corporation has physical control of its property, it may, if the debt be honest, prefer one creditor to another, although that creditor be a director. I have not access to this decision, if made. If that court has so broadly ruled, it stands solitary and alone against the courts of this country. And, with all due respect, I assert that such a doctrine, if carried to its logical and practical end, would lead to an open sea of piracy. It would strip such corporate officers entirely of their trust relation, and put the public dealing with the corporation at their mercy. It would be an advance step in the abuse of power by business corporations, and would tend to remove the restraining hand of the state and the courts, which hitherto has been supposed to hold these corporations to the responsibilities of public servants, deriving their life from the sovereign grant of the state, clothing them with something more than the power to do business without the individual responsibility which attaches to a citizen engaged in trade and commerce. The conservative and preservative tendency of the courts in later days has been to establish and maintain the doctrine that these corporations, being the creatures of the state, clothed with peculiar powers, privileges, and exemptions, owe such duty to the public as of right should impress their managing officers with the high trust not to take to themselves special advantages, to the exclusion of those dealing with them upon the faith of their being impartial representatives, not only of the incorporators and stockholders, but of the public generally. And in my humble judgment it will be a sorry day for the public welfare when this wholesome doctrine shall be stricken down by the hand of the courts. Mr. Justice Harlan, in Manufacturing Co. v. Hutchinson, 11 C. C. A. 320, 63 Fed. 496–503, has so satisfactorily presented the views I have long entertained on this question that it meets the case in hand to make therefrom the following extensive quotation:

"As between an individual and those with whom he transacts business, there is no relation of trust or confidence, in respect to his property, that affects his absolute right to dispose of it as to him seems fit. He is not bound to devote his property to any particular uses, or to the discharge of any particular debts. But his entire estate, so far as it is not burdened by himself

with liens, or exempted by law from execution, may be reached by appropriate proceedings, and subjected to sale in satisfaction of his debts. If his property is insufficient at the time of his insolvency to discharge all his liabilities, unpaid creditors may abide their time, and, until their claims are barred by limitation, look to any property thereafter acquired by him. In short, every one contracts with an individual upon the basis of his absolute dominion over his property, except as its disposition when he becomes insolvent, or contemplates insolvency, may be restricted, as in many jurisdictions it is restricted, by express statute. But the situation is wholly different in the case of a private corporation, whose property, in the hands of its directors or managing agents, is, by the law of its being, devoted to the special objects for which it was created. Because it is so devoted, those who take it with notice that it is being applied to purposes foreign to the objects for which the corporation was established, may be compelled, at the instance of proper parties, to surrender or to account for its proceeds. Russell v. Waterworks Co., L. R. 20 Eq. 474, 479; Studdert v. Grosvenor, 33 Ch. Div. 528, 539, 540. Upon like grounds, equity will enjoin the managing agents of a corporation from using its funds for objects not germane to its authorized business; and as, in the absence of a statute prescribing a contrary rule, creditors of a private corporation cannot look for their security to the private estate, either of the corporators or of those who manage its property, the only resource of creditors, when a corporation is dissolved, or becomes insolvent, and ceases to prosecute its business, is the property in the hands of its managing officers. The law, in effect, says to all who deal with private corporations that they must look to this property as the only security for the fulfillment of its obligations; and, if the law gives this assurance to creditors of a corporation, those who are authorized to represent it in its dealings with the public, who control and manage its property, and upon whose fidelity and integrity the public, as well as creditors, rely, ought not to be permitted, when the corporation becomes insolvent and abandons the objects for which it was created, to appropriate to themselves, as creditors, any more of the common fund in their hands than is ratably their share. If, upon becoming insolvent, a corporation should invoke the aid of a court of equity for the distribution of its assets, creditors would be paid pari passu in ratable proportions. Those, therefore, who hold fiduciary relations to creditors, ought not to be allowed, by any form of proceeding, or by their own act, after the corporation is practically extinct, to appropriate its property for their special benefit, to the injury of those who, upon every principle of justice, have equal rights with themselves."

A sound public policy, in my judgment, demands that when a business corporation has reached a point in its affairs when its directors know that it cannot pay its debts, and, for the lack of sustenance, cannot longer do business, or cannot "act up to the design of its creation," it is then, to all intents and purposes, insolvent. In such conjuncture its directors ought not to be permitted to take advantage of their position as managing officers to appropriate its remaining assets to the payment of their unsecured debts, to the exclusion of other unsecured creditors. Until overruled in this judgment, I shall continue to so administer the law.

A brief review of the history of this corporation is important, to understand fully the conclusion reached on this branch of the case. At the time the conception took possession of the speculative mind of Mr. Black to build this real-estate exchange, real estate in that locality, in consequence of the trend of trade and commerce to other portions of the city, had greatly depreciated in value, perhaps to the extent of 50 per cent. from what it was a few years previous. Black's conception was, by taking advantage of the excitement over

building up an extensive cotton trade in the city, to interest merchants and other business men in an effort to concentrate this business in an exchange building, as its tendency would be, not only to impart greater value to such building property, but to enhance the value of other real estate in the immediate locality, by making this building a centripetal force to draw hither departed business. Possessed, like most of his kind, with the gift of "fair presentment," he succeeded in imparting something of his own enthusiasm to other business men. He bought the real estate at a low figure, and succeeded in inducing other property owners in the locality to subscribe a bonus of $40,000 towards the erection of the building. Among those thus most drawn into the enterprise were the other defendants, Mathews and Wilkins, to whom he transferred $20,000 of said bonus or first bonds, by way of inducement, reserving to himself the remainder thereof. When the building had reached a point towards its completion where only about eight or nine thousand dollars were required to complete it, it was ascertained, according to their claim, that the cost and value of the building and grounds had greatly exceeded the capital stock of the company; the net cost, after deducting said bonus, being about $88,000. Instead of pursuing the customary, statutory method, of calling the stockholders together to vote an increase of stock to cover this claimed value of corporate property, they resorted to the scheme of organizing a new corporation, clothed with like powers to that of the existing corporation, with the purpose, expressed on the face of the charter, of buying out the property of the first corporation. Exactly why this device was resorted to, consistently with sound, honest, business purposes, is not quite apparent. Had they voted to increase the capital stock to $125,000, from $50,000, and paid up that stock, it would have been so much assets in the hands of the corporation, as a trust fund for its successful operation and for the benefit of creditors. But, as shown by the result, they went through the semblance of a cash payment of $125,000 to the old corporation, while in fact they turned over to the new company the property on the valuation of $200,000, whereby they paid off the so-called cash payment of $125,000, and received in addition thereto, for the benefit of the individual stockholders, the $75,000 in bonds. It is no satisfactory answer to this transaction to say, as counsel do in argument, that the stockholders had the right, under the statute of the state, to organize another company. A person's statutory right to do an act, and his underlying motive in exercising the privilege, are quite two different things, in the eye of a chancellor, in searching out the real inspiration and purpose of the act. A pretty clear insight is furnished into the underlying motive in resorting to the organization of a new company, in one of the letters written by the then counsel for these concerns to Mr. Black, who was at the time residing in the city of New York, as follows:

"As already explained in a former letter, the following is about the plan agreed on: The stockholders in the new company will pay up in full, which will give the new company one hundred and twenty-five thousand dollars in cash. Then the new company proposes to buy from the old company the

Cotton Exchange Building for $200,000.00,—$125,000.00 cash, and the balance ($75,000.00) in bonds. The old company will then have $200,000.00 in cash and bonds, which it proposes to dispose of at once to its stockholders. Of course, the cash will go to reimburse the stockholders for the cash they paid for stock in the new company, and, as Messrs. Mathews and Wilkins are carrying me, I would use my part of the cash to repay them the money loaned me to pay up my stock. You will be entitled to $25,000.00 of the bonds, which will be your private property, which I will hold subject to your order, and will also transfer you your pro rata of the stock of the new company. No doubt, you and Messrs. Mathews and Wilkins will confer as to how you will dispose of your bonds,—whether in the lump, or each party on his separate account. It will, no doubt, be advisable to dispose of them in a lump, but there is time enough to consider this."

The completion of the building was celebrated with the customary "blow-out," in speeches, wine, and terrapin.   The building was large and showy.   It was divided into many rooms, suitable for offices. High rental valuations were placed on paper, big with expectation. It may be but just to the defendants to say that under the eloquence of that occasion, and the high hopes inspired by the banquet and the rental figures, they became pregnant with expectation of large rentals to accrue, sufficient to meet the interest on these bonds, and to have a fair margin.   But from the very outset there was no realization of these expectations.   The evidence shows that perhaps at no time was more than one-third of the rooms of this building rented. Year after year the income from the building decreased, until its income was inadequate to pay the interest on the bonds and to defray its incidental expenses.   So that, in order to keep up "appearances," the defendants Mathews and Wilkins and A. G. Black had to furnish, through the business houses of which they were members, from time to time, moneys sufficient to meet this deficiency.   It is to be conceded to the defendants that if this money thus furnished by them were advanced for the purpose of keeping the building "a going concern," and with honest expectation that by such advancements they would preserve its business life, and reach ultimate success in its affairs, a court of equity would recognize such debts as highly meritorious, so as to justify the directors in reimbursing themselves out of the assets of the concern while it was going.   But it is inconceivable to my mind, in view of the evidence, as a whole, bearing upon this issue, how business men of ordinary judgment and capacity could at any time, after the year 1885, have entertained a sincere opinion that there was any future for this enterprise.   The promised return of departed business to that locality, and the resuscitation of property values, failed more and more as the years and months passed by.   The cotton trade itself did not concentrate as expected in this building, and that specialty for the city of St. Louis failed more and more each year.   The rentals continually declined.   The income continually grew less.   So that it is too apparent to admit of debate that little less than a revolution in the trend of trade and business centers in the city of St. Louis could give any reasonable hope of any future for this building.   The taxes for the year 1886 were never paid by the defendants.   And, had the corporation depended alone upon its income from all sources for the payment of its expenses and interest on these bonds, there would have been

a default much earlier than it occurred. Confronted with such a state of facts, and overwhelmed with such an uninviting prospect, it would require a charity that would amount to overcredulity to concede to the defendants that they were furnishing this money with any reasonable expectation that by tiding over the present they hoped to .work out the redemption of this property from debt. No better evidence could be furnished of the great depreciation of this property than the fact that when it was sold in April, 1888, at public auction, it brought only $50,000. It is true, in a sense, that this corporation continued to be "a going concern" up to the date of the sale under the deed of· trust,—April 3, 1888. .There were some tenants in the building. But does this meet the spirit of the law? If so, as long as there was a single tenant in the building under a lease, old as well as new, the directors could appropriate every dollar of the income in payment of antecedent debts to themselves, although it ' was in default on every other liability incurred, and without a shadow of expectation of paying a cent to any other creditor. Insolvency, according to the general rule, is that condition of a person who is unable to pay his debts as they mature, or in the usual course of trade and business; and when such a condition, as applied to a business corporation, is coupled with the further fact that the debtor has no reasonable grounds of expectation of a future ability to pay, and exists merely by sufferance, it is, in contemplation of law, in articulo mortis. This corporation, after 1886, existed solely for the benefit of the directors. Its only income was the meager pittance received from expiring tenancies. There was no promise of renewed life. Its income was wholly inadequate to meet its liabilities. The little money realized from rentals was appropriated by the directors to themselves, leaving the taxes for the year 1886 unpaid, and they defaulted in the payment of interest on the bonds in October, 1887. Attempt is made on behalf of defendants to justify this appropriation of assets by claiming that this money was taken to reimburse, not themselves directly, but the business firms with which they were connected as partners, claiming that the money was advanced in fact by said firms. But it is quite clear to my mind that the moneys thus furnished were really for, and on the individual account of, these defendants. They simply made entries of the advancements on the books of their respective houses as a matter of convenience, and the loans were regarded and treated as made by them, and on their responsibility. This was the actual substance and effect of the method pursued, no matter what the form. Claim is also made that this money was so advanced with the understanding that it was to be reimbursed out of the rentals on this property, whereby it is sought to place these defendants in the attitude of special creditors. I am unable to find any evidence in this record of any such agreement on which such claim can be predicated. The moneys were advanced from time to time by these defendants to meet "current expenses," and to prevent a breach of the conditions of the mortgage bonds, whereby they were enabled to stave off the inevitable day of foreclosure, and to retain physical control of the property. The evidence shows that these payments were made as follows:

| To Senter & Co., | April 5, 1886 | $ 450 00 |
| " " " | September 15, 1886 | 515 56 |
| " " " | July 30, 1887 | 210 00 |
| " " " | August 30, 1888 | 95 00 |
| " " " | August 30, 1888 | 762 39 |
| Total | | $2,032 95 |

Mathews & Whitaker had returned to them:

| April 15, 1886 | $ 500 00 |
| September 15, 1886 | 573 30 |
| July 30, 1887 | 233 50 |
| August 30, 1888 | 699 83 |
| Total | $2,006 63 |

Williams, Black & Co. had returned to them:

| September 15, 1886 | $ 629 67 |
| July 30, 1887 | 256 50 |
| August 30, 1888 | 806 03 |
| Total | $1,692 20 |

The last collection of rent was made May 9, 1888. The amount of the taxes for the year 1886 was $2,362.32. The cash balance on hand April 1, 1888, was $1,513.75, two days before the foreclosure sale; and a collection was made and paid in as late as January, 1889. The whole tendency of the facts and circumstances attending this transaction persuades me that all moneys thus appropriated to the benefit of these directors after the last payment of interest on the bonds, in April, 1887, were taken and appropriated with the conscious knowledge on the part of the directors that the corporation was irretrievably insolvent, and would be unable to pay the then accrued taxes, and to meet the next installment of interest in October, 1887, and that they received such sum charged with a trust in favor of all creditors of the corporation. Accordingly, I find: That there was so received, to the use and benefit of the defendant Wilkins, on July 30, 1887, $210.00; on August 30, 1888, $95, and on the same date $762.39,—with which he is chargeable with interest at the rate of 6 per cent. per annum from the date when so received. That the defendant Mathews is likewise chargeable with the sum of $233.50, with interest thereon at 6 per cent. per annum from July 30, 1887, and the sum of $699.83, with like interest from the 30th day of August, 1888. And that the defendant A. G. Black is likewise chargeable with the sum of $256.50, with like interest thereon from July 30, 1887, and with $806.03, with like interest thereon from August 30, 1888.

The final contention of counsel for respondents is that the respondent A. G. Black was not a director of this corporation, and that the money received by the corporation was for the benefit of the firm of which he was a member, in the city of New York. The facts are that William L. Black and A. G. Black are brothers, and the money advanced by A. G. Black was through his firm in New York, just as, in the case of Mathews and Wilkins, through their respective firms; the said A. G. Black becoming the holder of the

stock originally owned by William L. Black, taken in liquidation of the indebtedness to him of said William L. Black. In the constitution of the governing board of the real-estate company, A. G. Black being a nonresident of the state, and therefore disqualified to act as a director of a corporation in this state, he allowed William L. Black to hold one share of his stock, merely to enable him to qualify as a director. The balance of his stock was left in the name of the respondent Silas B. Jones, who was the attorney for the company, but held in trust for the use and benefit of said A. G. Black. It would be a travesty of justice if this nonresident stockholder could be permitted to organize a business corporation under the laws of this state, through a mere resident figurehead, and while taking to himself the protection of the laws of the state, and the benefits of the incorporation, as a real manager, he could escape the just responsibilities attaching to the office of a director. The law looks to substance, rather than form. A court of equity has no respect for mere shams. Decree will go comformably to this opinion.