CHARLES R. HEMENWAY, AS TRUSTEE OF THE HONOLULU CLAY CO., LTD., BANKRUPT, v. HONOLULU CLAY CO., LTD., F. J. LOWREY, FRANK HUSTACE, F. J. AMWEG, O. L. SORENSON, J. B. ROHRER, J. R. BURNS, C. H. COOKE, F. C. ATHERTON, W. GEHRING, F. B. DAMON, M. L. SMITH, H. L. KERR, C. T. ELLISON, F. L. LITHERLAND, T. McCANTS STEWART, W. R. CASTLE, JR., AND A. N. CAMPBELL.

APPEAL FROM CIRCUIT JUDGE, FIRST CIRCUIT.

SUBMITTED DECEMBER 17, 1906. DECIDED JANUARY 14, 1907.

FREAR, C.J., HARTWELL AND WILDER, JJ.

STOCKHOLDERS' LIABILITY TO CREDITORS—*when stock is paid for in property.*

> Although as a rule stockholders of an insolvent corporation are liable to its creditors for the amounts unpaid upon their stock even though the stock has been issued as fully paid, whether in money or property, yet if it has been so issued in return for property which was honestly and reasonably believed at the time to be worth the par value of the stock, it must be regarded as fully paid even though the property turns out to be of a less value.

OPINION OF THE COURT BY FREAR, C.J.

This is a bill in equity by the trustee in bankruptcy of the Honolulu Clay Co., Ltd., an Hawaiian corporation, with liabilities of $15,377.05 and no assets, to recover from its stockholders the amount alleged to be unpaid upon a portion of the stock to an extent sufficient to meet the liabilities of the corporation. The circuit judge held that all the stock had been fully paid and that nothing further could be recovered from the stockholders. The petitioner appealed.

The defendants Kerr and Smith, referred to as the promoters, and Ellison and Litherland, clay and brick experts, after prospecting and experimenting, obtained the necessary land, machinery, etc., and established certain brick works, and after conducting the business of brick making for a time as partners under the name of the Honolulu Clay Company, incorporated in May, 1900, under the name of the Honolulu Clay Company, Limited, with a capital stock of $100,000 divided into 1000 shares of the par value of $100 each. Seven hundred and fifty shares were issued as fully paid in exchange for the property and business of the partnership, of which 230 were taken by each of the promoters and 145 by each of the experts. One share was given as paid up to the attorney for legal services. The remaining shares were issued as assessable and were in time fully paid up in cash. Nearly a year later, when there was at least much question as to the success of the venture, it was agreed that upon the holders of assessable stock paying in the last assessment of 25 per cent. the promoters would turn over to them a portion of the paid up stock in the proportion of two shares of paid up to five shares of assessable stock. A year and a half or so later still the concern ceased business. Foreclosure proceedings on a mortgage were instituted April 27, 1904, resulting in a sale of the property of the corporation the following August, and the issuance and return of an execution unsatisfied on a deficiency judgment, followed by an adjudication of bankruptcy in December of the same year. The petitioner claims that the property received for the stock originally issued as fully paid was worth only $30,000 and that the present holders of such stock are liable for the balance of $45,000 to the extent necessary to pay the debts of the corporation.

We will assume that those who subsequently received a portion of the paid up stock took it with notice of all the facts and that they are therefore bound equally with original holders, but, of course, they are not liable if original holders are not. We will assume also that the trustee in bankruptcy, as representing the creditors, is not estopped from setting up liability

on the part of the stockholders by reason of the fact that a full description of the property intended to represent the paid up stock was sworn to and filed with the Territorial treasurer as required by law—on the theory that the creditors had notice, constructive if not actual, of what property had been turned over and of the fact that its conveyance was intended as full payment for the stock, and did not give or should not have given credit in reliance upon a supposed further liability.

The so-called trust fund theory, upon which this suit is founded, is thoroughly established in the United States, although it has not obtained a foothold in England. It is that the capital stock of a corporation, and especially its unpaid portion, is a trust fund for the benefit of creditors. This does not mean that the creditors have a lien upon it or an equitable interest in it but merely that it can be reached in equity by them and must be applied equitably for their benefit upon the insolvency of the corporation. Capital that has been paid in cannot be distributed among the stockholders nor can the latter be relieved from liability for what has not been paid in, to the detriment of creditors. Corporators are relieved from the unlimited personal liability of partners and the capital stock is the only fund to which creditors may look; the courts therefore hold the stockholders to a strict account to the extent of the par value of the capital stock. All sorts of devices are resorted to in order to evade this liability and obtain stock without paying in full for it, but equity looks at the substance of the transaction in each case and refuses to give effect to such devices whenever necessary for the protection of creditors. It is not necessary, however, that stock should be paid for in money. It may be paid for in such property, whether tangible or intangible, or services, as might properly be purchased or paid for by the corporation. It is not necessary to go through the idle form of calling in the money for the stock and then paying it back for the property or services. If payments for the stock have been made in money, or in property of a determinate value, such as good notes or bonds or stocks or other

property of known or ascertainable market value, there is little
difficulty in determining whether the stock has been paid in
full and, if not, to what extent it has been paid.  If the prop-
erty is of indeterminate value, the difficulty is greater and more
or less scope must be allowed for difference of opinion as to its
value.  If it is of such a nature that its value, if it may be
called value, is not only indeterminate but of such an unsub-
stantial, shadowy, fictitious or imaginary character, that no
valuation can reasonably be placed upon it as an exercise of
good business sense, it cannot properly be applied at all towards
payment of stock.  Much diversity of opinion exists as to the
proper method of ascertaining whether stock has been paid in
full.  In the main two rules have been followed although with
some variation in their application.  One is the so-called true
value rule, under which stock, in order to absolve the holders
from further liability, must have been paid in full in money
or in money's worth—money's worth being the true value of
the property irrespective of any question of fraud, mistake,
error in judgment or "cheerful optimism."  This rule does not
take sufficient account of ordinary and reasonable business
methods and, by substituting the opinion of the court or judge,
formed perhaps largely in the light of subsequent events, for
the honest opinion of the contracting parties at the time, tends
to make it dangerous for owners of property to transfer it to
corporations for stock, to cripple corporations in the prosecu-
tion of their purposes, and to prevent the doing in a direct and
simple manner of what might be done in a round about way.
The other rule is the so-called good faith rule, under which
stockholders are relieved from further liability in case of pay-
ment in property if it has been turned in at what is in good
faith believed by the transferrers and those representing the
corporation to be its fair value.  The stockholders are not fur-
ther liable except in case of fraud.  They are not liable for
mistakes of judgment.  This is the rule applied by the supreme
court of the United States and in our opinion is supported not
only by the better reasoning but by the weight of authority.

See *Coit v. Gold Amalgamating Co.,* 119 U. S. 343; *Fort Madison Bank v. Alden,* 129 U. S. 372; *Fogg v. Blair,* 139 U. S. 118; *Camden v. Stuart,* 144 U. S. 104. What, however, is sufficient to constitute or show fraud is another question. Some courts hold that there must be actual fraud and there are expressions by the federal supreme court which point that way, although it is agreed by all courts, including that court, that gross overvaluation alone is strong evidence of fraud. In such case some courts are inclined to call the fraud actual and others constructive. The better view would seem to be that by fraud, as used in this class of cases, there should not be meant an intention to deceive or defraud others, but that it should be sufficient if there is an intention to do what is not authorized by law; in other words, an intentional overvaluation, or overvaluation with knowledge of that fact, should be sufficient to establish liability for further payment. · That is all that the stockholders could reasonably ask. It would allow them ample scope for the exercise of judgment and hold them only to the extent to which they themselves knew or ought to have known that they had not paid up. Such intention or knowledge may be shown by the mere fact of gross overvaluation or by other facts. Gross overvaluation alone may not be sufficient, for the presumption raised by that may be overcome by proof of mere error in judgment or the exercise of an honest opinion by men of ordinary sound business sense. It is doubtful if the federal supreme court would hold that more than intentional overvaluation is necessary. Whether it is or not, we will assume for the benefit of the petitioner that it is not. The greater the indeterminateness in the value of the property, so long as the value is not so purely conjectural that it cannot be regarded, the greater the room for an honest difference of opinion, and in determining whether the valuation placed upon property was in good faith believed to be its true value, the circumstances at the time must be considered. It is not enough to show that the property has since depreciated in value or that it has since

turned out or been ascertained to be of less value than it was in good faith supposed to be at the time.

In the present case the property turned over to the corporation in payment for stock of the par value of $75,000 is admitted to have cost only about $30,000 and to have been actually worth not more than that amount. The land had been purchased by the promoters only five months before for about $8000 and was worth not more than that, and the other property had cost about $22,000. The whole was returned for taxation seven months later at $30,000. The dower rights of the promoters' wives were not released until about a year after the conveyance to the corporation. These facts in regard to the purchase price of the land, the return for taxation and the release of dower rights were not permitted to be shown in the trial court but we will assume for the petitioner that they ought to have been allowed and that we may properly consider them. A brick machine that cost only about $1000 at the factory on the mainland was valued in the affidavit filed on incorporation at $2000 as its value set up at the brick works and a gasoline engine which cost only $1350 in Honolulu was valued at $2200 set up at the works in the same city. The property when taken over was subject to a mortgage of $4500. The assessable stockholders did not expect to be called on to pay more than 75 per cent., and the promoters represented that probably not more than that would be required. When the remaining 25 per cent. was found to be required the assessable stockholders thought that, in order to even matters up in view of the fact that as they then believed the property had been turned over at too high a valuation, the promoters should turn over to them some of the paid up stock, which was done. All this might seem to indicate that the property when turned over was not in good faith believed to be of the full par value of the stock for which it was intended as payment and perhaps that conclusion would have to be drawn were it not for other evidence in the case.

It may fairly be inferred from the evidence that both the assessable stockholders and the promoters honestly believed at the time that the property was worth the amount for which it was turned over to the corporation. The promoters had long prospected for clay suitable for bricks on this island and after sending samples from various localities to the mainland for testing selected the site in question as the only one containing suitable clay. That site contained, as shown by borings, enough clay to make 120,000,000 bricks. The bricks made in Seattle from samples of this clay passed all the United States government tests and were believed to be of excellent quality. Bricks were selling in this city at $22 a thousand and bricks made of this clay by this concern before its incorporation sold at that price at what was estimated to be a profit of $16 a thousand. The demand for bricks in this city then amounted to about 500,000 a month. The machine then had a capacity of about 30,000 bricks a day but more kilns were needed for handling that number. The promoters and the two experts believed that the clay was suitable for brick making and, if it was, there could be no doubt that the property, which included the only suitable clay discovered on this island, was worth the amount for which it was turned over. The promoters, or at least one of them, put in all their own capital and apparently would not have incorporated and let in others unless they had been in need of further capital for installing additional kilns and other purposes. They concluded that the best way to obtain the additional capital was to incorporate and issue a certain amount of assessable stock. They prepared a prospectus representing the actual conditions as they believed them, specifying the property and inviting inspection. They asked some to subscribe and others asked them for the privilege of subscribing. Those who subscribed were largely men of known good business judgment, and took the stock with full knowledge of the conditions and believing that the property turned over by the promoters was worth the par value of the stock issued for it. Everything was open

and above board. The assessable stockholders, as business men, with knowledge of the facts, were willin practically to purchase a substantial interest in the property at the valuation placed upon it by the promoters. The clay, however, proved not to be as good as it was believed to be and some contractors specified for California bricks, thus excluding Honolulu bricks. Conditions changed also in other respects. Building operations fell off in Honolulu and the demand for brick decreased in consequence. The cost of making bricks was found to be higher than was anticipated. A long spell of rainy weather prevented the bricks from drying properly. Finally it was a question whether to continue or give up the business. It was thought even then that by erecting drying sheds the business might yet prove profitable. At that time the assessable stockholders had paid in 75 per cent. The remaining 25 per cent. would furnish the necessary capital. The assessable stockholders, although they originally expected that they would not be called upon for more than 75 per cent., and that the earnings of the concern would supply the balance if needed, understood also that they were liable to be called on for the remaining 25 per cent., but it was a question whether it would be money thrown away to pay this in and it was finally concluded to make a further attempt at success, but although all understood at the incorporation precisely what property was turned over and believed that it was worth the amount for which it was turned over, it was thought in view of the fact that it had proved to be of less value than had been supposed and the business had been less successful than had been anticipated, there should be some sacrifice by all stockholders. Accordingly, it was agreed, some witnesses say at the suggestion of the paid up stockholders, who likewise recognized the change in the conditions, that some of the paid up stock should be turned over to the assessable holders, and that the latter should pay up the balance on their assessable stock. One of the assessable stockholders felt so sanguine of success even at that late day that he purchased $8,800 worth of paid up stock in addition to the pro rata that was to be given to him. It is

clear that both paid up and assessable stockholders not only knew of what the property consisted but believed at the time that it was worth the value placed upon it, and, further, in view of the tests that had been made, had reason to believe, as a matter of business judgment, that it was worth that. The value of the land, say $8000 or less, for other purposes was no criterion of its value as a clay deposit. The liability of the stockholders depends upon the value as it appeared at the time, not as it appears in the light of subsequent events. In our opinion this is one of those cases in which the property turned over for paid up stock was honestly and reasonably believed to be worth the par value of the stock but did not "pan out" to have been of that value—in which case the stock must be regarded as fully paid.

The decree appealed from is affirmed.

*Smith & Lewis, L. J. Warren* and *C. R. Hemenway* for the petitioner.

*Castle & Withington* for defendants Lowrey, Hustace and Campbell; *E. A. Mott-Smith* for defendants Cooke, Atherton, Sorenson and Damon; *Magoon & Lightfoot* for defendant Kerr.